A91A0957. COLLINS v. THE STATE.
A91A0990. SHAW v. THE STATE.
(414 SE2d 297)

Judge Arnold Shulman.

The appellants, Janice Faye Collins and Gary Dewayne Shaw, were jointly tried and convicted of arson in the first degree. They appeal from the denial of their respective motions for new trial, contending that the evidence was insufficient to support the jury's verdict.

The appellants were charged with setting fire to a mobile home owned by appellant Collins, which she had occupied with her young son and appellant Shaw. A neighbor who occupied the mobile home next door testified that at approximately 11:00 p.m. on the night of the fire, he heard a vehicle approach, looked outside his door, and saw the appellants' car parked with the motor running. He stated that the vehicle remained there for approximately five minutes and then left. Some five or ten minutes later, the neighbor heard "popping and cracking" noises, and his son heard "a loud bang," like glass breaking. The two of them looked outside at this time and saw flames coming from the bedroom window of the appellants' home, and the son then went to the home of the maintenance man for the mobile home park

to telephone the fire department. The son testified that as he was walking back to the site of the fire, he saw the two appellants drive by in their car, while the maintenance man testified that he saw a car which "resembled" the appellants' vehicle stop, turn off its lights, and depart a few minutes later. The maintenance man further testified that appellants were seven or eight days late in paying the $90 rent on their lot and that he had told Shaw earlier that evening that if the rent were not paid within five days, he and Collins would be evicted from the mobile home park.

The fire was reported at 11:05 p.m., and at 11:20 p.m. firemen arrived on the scene to find the mobile home "pretty much fully consumed" in flames. At least one other fire occurred in the vicinity at the same time, and the firemen went back and forth between them. The appellants arrived on the scene at approximately 1:15 a.m. Shaw appeared to the fire fighters to be "fairly upset," while Collins appeared "extremely upset" and was crying.

Mr. Allen Key, an investigator employed by the Fort Oglethorpe Fire Department who had previously investigated about 45 fires, arrived at the scene at about the same time as the appellants. Upon examining the interior of the home, he observed that the springs on the bed in the master bedroom had collapsed towards the center of the bed, and based solely on that observation he formed the opinion that "the fire was [of] an incendiary [nature] set on the bed using a flammable liquid." He stated that he did not detect any flammable liquid pour patterns but could find no other possible cause for the fire and suspected arson because he saw no personal photographs in the home, and very few articles of clothing. He acknowledged, however, that he had not looked inside any of the cabinets or closets in the home. Key testified that there was only one electrical appliance, a radio, plugged into the wall sockets in the appellants' bedroom and that this was not the cause of the fire. He further testified that although some of the breakers in the electrical breaker box were tripped, indicating that electrical shortages had occurred, the box was not sufficiently damaged to suggest to him that the fire had started there.

Key took a single sample of material from underneath the bed and sent it to the State Crime Laboratory for analysis. The forensic chemist who analyzed this sample testified that his tests revealed the presence of "a heavy petroleum distillate product," such as kerosene, diesel fuel, lamp oil or charcoal starter. However, he acknowledged that such petroleum distillates could be found in common household products such as furniture preparations, insecticides, and cosmetics. In addition, he conceded that it was "very important" in such cases to test the container which had housed the sample in order to eliminate the possibility of contamination by the container, but that no such testing had been performed in this case.

Lieutenant Larry Black of the Catoosa County Sheriff's Department was summoned to the scene by Key at approximately 1:15 a.m. to assist in the investigation. Upon his arrival, he interviewed the appellants and, with their permission, searched their car. Inside the trunk, he found a photograph album, several loose photographs, and a laundry basket containing various articles of clothing belonging primarily to Collins' son. Collins also consented to a search of her handbag, which contained military discharge papers belonging to her recently deceased husband, a letter from the Veterans Administration concerning the procedure for making benefit claims, an insurance policy on the mobile home, title and registration papers for the car, a bill from the lienholder on the mobile home, and one or more birth certificates.

When questioned by Black about her whereabouts earlier that night, Collins asserted that her clothes dryer had not been working and that she had left with her son and Shaw at approximately 9:00 p.m. to go to her sister's home in East Ridge, Tennessee, to dry some clothing for her son to wear to school the next day. She stated that they had run out of gas on the interstate on the way back and that after about 45 minutes, an East Ridge police officer had stopped and agreed to take Shaw to a gas station to get some gas. However, no gas can was available at the station, and the officer had accordingly driven Shaw to a friend's home to borrow one. He had then driven Shaw back to the gas station to purchase some gas, and thence back to the car, where Collins and her son were still waiting. Collins told Black that after getting their car started, she and Shaw returned to the mobile home to get some money for cigarettes and then drove to a convenience store. Black called the East Ridge Police Department to verify this information and was informed that their police log showed that an officer had stopped to assist the appellants at 10:35 p.m. that evening. Asked about the status of her payments on the mobile home, Collins told Black that she was current except for the last month's payment, which was late, and this information was also verified.

Collins repeatedly denied any involvement in the fire, insisting that she had nothing to gain from it. Although she had a fire insurance policy on the mobile home, it was shown that all of the policy proceeds had been paid to the lienholder to cover the outstanding balance on the note, which slightly exceeded the cash value of the mobile home. Conceding that this was "not an arson for profit," Black testified that he made the decision to charge the appellants based on Key's opinion that the fire had been deliberately set and his own suspicions arising from the items found in their vehicle and in Collins' handbag, combined with his feeling that Collins "was being untruthful . . . on the time period and the sequence of events and how they occurred."

The defense called as a witness Mr. Charles Robert Love, an expert in the field of arson investigation who had investigated more than 4,000 fires over the past 18 years and who had been hired by the county to investigate the cause of the fire in the present case. Based on observations made during the course of three separate visits to the scene, he characterized the fire as a slow ignition or "cool fire," and he expressed surprise that it had not been more destructive, stating that fires in mobile homes and automobiles tended to burn some 2,000 degrees hotter than house fires. He testified that the particle board floor inside the mobile home was still intact but that the ceiling and the wood trusses supporting it were destroyed. He asserted that there was no evidence "whatsoever" that an accelerant had been poured on the mattress, stating that the heat from such a source normally remained low, whereas in the present case the greatest damage was to the ceiling, and the window sills were burned at the top but not at the bottom. He testified that the appellants told him they had been experiencing certain electrical problems such as lights dimming and blowing, which he considered to be warning signs of an electrical overload. He further stated that there was a hole melted in the steel cover of the breaker box and that the electrical wires in the ceiling over the bed were very brittle, a condition which, he said, "does not happen in an accelerant fire, [but] only . . . from a long duration overload," which causes the wires to "bake." In his opinion, the fire was "of accidental origin of electrical ignition," resulting from "a massive overloading" of these electrical wires.

Love discounted the results of the crime lab tests which had been performed on the sample of material taken from underneath the bed by investigator Key, stating that "incidental accelerants" could be present naturally in carpet, carpet backing, and particle board, and that pyrolysis, or burning, of the carpet and backing could itself create such hydrocarbons. He asserted that Key's failure to obtain comparative samples from other areas of the dwelling had consequently deprived these test results of any significance. Love testified that in his experience, it was not unusual for the metal springs of a boxspring mattress to collapse when the cotton covering burned, but that where a large amount of accelerant was used the springs would curl "like a pretzel." He recalled having seen furniture, kitchen equipment, and other personal items inside the mobile home, including "an ocean of clothing and bedding"; and the next door neighbor similarly recalled having seen furniture and "a lot of clothes all over the yard" the day after the fire. It was shown, however, that the appellants had received no insurance benefits for the loss of their personal property.

Asked about his activities prior to the fire, appellant Shaw testified that he had been cleaning a bedroom that day and had placed some photographs in the trunk of the car to be taken for enlargement.

With respect to the documents found in her handbag, appellant Collins testified that she was in the process of submitting a claim for survivor's benefits to the Veteran's Administration on behalf of her son, whose father had recently died, and that she had recently received the car title and the insurance policy in the mail. It was shown that a metal box containing what appeared to be other personal papers had been found inside the home after the fire. The appellants described the electrical problems they had assertedly been experiencing prior to the fire and also told of having run out of gas on the interstate and of having been assisted by the police on the night of the fire.

In rebuttal, the state called the East Ridge police officer who had stopped to assist the appellants on the night of the fire. His testimony was for the most part consistent with that of the appellants, except that he asserted that the station log indicating that he had stopped to assist them at 10:35 p.m. could not be correct because his duty shift had not started until 11:00 p.m. The state also called as a rebuttal witness an investigator from the office of the State Fire Marshal who testified that the non-uniform manner in which the bed springs had collapsed was indicative of arson. However, this witness later conceded on cross-examination that the fire could also have been caused by an electrical overload, stating: "[I]t's very difficult to tell which came first, the fire or the shorting, and particularly in a mobile home where your . . . overhead wiring is against the metal roof, where all the heat is being collected and not being able to dissipate. . . ." Furthermore, he acknowledged that he had given the breaker box only a cursory examination and testified that if he had known of the electrical problems which the appellants had reportedly been experiencing, he would have examined the wiring more closely for indications of electrical malfunction.

On the last day of the trial, the burned bed springs were retrieved from the mobile home and brought to the courtroom by the defense, which sought unsuccessfully to introduce them into evidence. During the course of their deliberations, the jury requested permission to examine the springs, but the request was denied by the trial court. At 9:07 p.m., after approximately six hours of deliberation, the jury was given an *Allen* charge; and at 10:12 p.m., they returned guilty verdicts against the appellants. During the sentencing hearing it was revealed by defense counsel that the state had offered to recommend probation if the appellants pled guilty, but that they had refused the offer. Both were sentenced to serve five years in prison and five on probation.

1. "In an arson case, the corpus delicti consist in the proof of three fundamental facts: First, a burning; second, that a criminal agency was the cause of the burning; and, third, that the defendant

was the criminal agency. [Cit.]" *Cook v. State*, 146 Ga. App. 353, 354 (1) (246 SE2d 347) (1978). See also *Parker v. State*, 181 Ga. App. 590 (1) (353 SE2d 83) (1987). The evidence that the fire in the present case was of incendiary origin and that the appellants were responsible for it is, of course, entirely circumstantial. " ' "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis of guilt, save that of the guilt of the accused. (OCGA § 24-4-6.) As the state correctly asserts in its brief, the question of whether every other reasonable hypothesis has been excluded is generally a question for the jury. On the other hand, the trial court is authorized, as usual, to take the case from the jury and direct a verdict of acquittal if the state clearly fails to meet its burden. Should a trial court decline to direct the verdict and the jury finds the defendant guilty, we are obliged to review the evidence in a light most favorable to the jury verdict. However, we will not be blinded by the jury verdict when a reasonable hypothesis of innocence appears from the evidence or the lack thereof." . . . [Cit.]' *Dawson v. State*, 183 Ga. App. 94, 96-97 (2) (357 SE2d 891) (1987)." *Solomon v. State*, 195 Ga. App. 684, 687-688 (1) (394 SE2d 570) (1990).

While the appellants in this case obviously had the opportunity to start the fire, they had no apparent motive for doing so, and "[w]ithout more, the fact that [they] had exclusive access to the property, as many if not most property owners do, raises no inference of incendiarism on [their] part." *Southern Trust Ins. Co. v. Braner*, 169 Ga. App. 567, 569 (1) (314 SE2d 241) (1984). It is apparent that the decision of the investigating officers to charge the appellants with arson was based, in large part, on the perceived absence of clothing and family photographs in the mobile home, combined with the presence of photographs and "important" papers in their car and in Collins' purse. However, the explanation offered by Collins for the presence of these papers in her purse was entirely reasonable, and there was evidence that the investigators would have found additional clothing and photographs inside the mobile home had they but opened the cabinets and closets. According to the appellants' expert, whose experience in arson investigations was significantly greater than that of the state's expert, the burn patterns found inside the mobile home were inconsistent with the state's theory of how the fire had started. On the other hand, it is evident that the state's investigators had made only the most cursory investigation of the electrical system, which the appellants' expert believed to be the source of the fire.

Under these circumstances, we are constrained to conclude that the evidence as a whole, even when construed in favor of the jury's verdict, fails to exclude every other reasonable hypothesis save that of the appellants' guilt. " 'At best, the evidence in this case raises a sus-

picion against [the appellants], but we do not think it connects [them] with the crime beyond a reasonable doubt. [Cits.]' [Cit.]" *Solomon*, supra at 688. Accord *Campbell v. State*, 169 Ga. App. 112 (312 SE2d 136) (1983). Compare *Davis v. State*, 178 Ga. App. 760 (2) (344 SE2d 730) (1986); *Lester v. State*, 145 Ga. App. 847 (1) (244 SE2d 880) (1978). Accordingly, we hold that the trial court erred in denying their motions for directed verdict.

2. The appellants' remaining enumerations of error are rendered moot by the foregoing.

*Judgments reversed. Sognier, C. J., Birdsong, P. J., Carley, P. J., and Cooper, J., concur. McMurray, P. J., Pope, Beasley and Andrews, JJ., dissent.*

BEASLEY, Judge, dissenting.

I respectfully dissent because the evidence was sufficient to authorize a rational trier of fact to find defendants guilty of the offense charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). We must consider the evidence in a light most favorable to the verdict, not as we might see it. *Chastain v. State*, 260 Ga. 789 (1) (400 SE2d 329) (1991).

In these cases, motions for new trial on the general grounds were heard by the trial judge and unequivocally denied. Thus we have also the opinion of the "thirteenth juror," who of course was present to evaluate weight of evidence and credibility of witnesses when it came to a consideration of the motion for new trial. "Before the verdict of the jury becomes final it should, where the defendant requires it by a motion for a new trial, receive the approval of the mind and conscience of one more man — the trial judge. Until all 13, the 12 jurors and the judge, agree upon the prisoner's guilt, his conviction is not legally final. The finding of the jury is not binding on the judge. It may be and for the most part should be highly persuasive upon him; but he is authorized to set it aside, and indeed is under the duty of doing so if he does not approve it as a finding of fact." *Walters v. State*, 6 Ga. App. 565, 567 (65 SE 357) (1909). See also 1983 Ga. Const., Art. VI, Sec. I, Par. IV; *Seaboard Air-Line R. Co. v. Benton*, 43 Ga. App. 495, 505 (19) (159 SE 717) (1931), reversed on other grounds 175 Ga. 491 (165 SE 593) (1932); *Housing Auth. of Atlanta v. Geter*, 252 Ga. 196, 197 (312 SE2d 309) (1984).

This authority and duty is not shared with the appellate court. Thus we cannot discount the evidence given by the fire department investigator in favor of the opinion evidence of defendants' expert witness. Likewise we are powerless to accept rather than reject the explanations given by the defendants, which were in large part uncorroborated. *Merritt v. State*, 190 Ga. 81, 87 (8 SE2d 386) (1940). See also *Thornton v. State*, 161 Ga. App. 296 (1) (287 SE2d 749) (1982).

" ' "Three things are necessary to sustain a conviction for arson: that the real property alleged in the indictment was in fact burned, that its cause was a criminal agency, and that the defendant was that criminal agency." ' " *Bragg v. State*, 175 Ga. App. 640, 641 (1) (334 SE2d 184) (1985). Accord *Campbell v. State*, 169 Ga. App. 112, 114 (312 SE2d 136) (1983). The controlling statute is OCGA § 16-7-60 (a) (3).

It is not contested that the property burned. The evidence is in conflict as to whether such burning was of incendiary origin, caused by a criminal agency. There was sufficient circumstantial evidence that defendants were the criminal agency. They were at the house trailer a few minutes before the fire was detected by neighbors. They had driven up, stayed a short time with the motor running, and left again just before the neighbor who discovered the fire looked out the window. Then they were seen driving nearby when a neighbor went to the maintenance man's home to summon the fire department. As the maintenance man was walking towards the burning trailer, the defendants passed him in their car, "driving real slow." They "pulled in of (sic) the street headed in, and shut the lights down, there was nobody got out of the car that I could see, and a few minutes when the fire department got there, the car left." The street on which he saw it stopped was a dead end street. He told the investigating officer that when he saw the car as it drove past him, he wondered why they were leaving, going in the opposite direction, when he was going to the fire at their trailer.

Defendants did not reappear at the scene until about 1:15 a.m. the next morning. They had with them their young son, clothing, valuable personal documents, and a number of family photographs as well as a photo album. The relative whom the defendants allegedly visited did not testify. Moreover, the evidence as to timing was in conflict, and there was evidence to refute defendants' evidence that they were in East Ridge, Tennessee, at the time they contended. The officer who assisted them on the highway testified that defendant Shaw told him they were going to the Golden Gallon to get bread and cigarettes, whereas Collins told the investigating officer that the officer assisted them when they were returning from her relative's home.

The maintenance man, who also collected rent, testified that defendants were late in the rent payment. He had told defendant Shaw, several hours before the fire, that they were being given notice that they would be evicted if they did not pay. They apparently did not have the money, inasmuch as the witness testified that Shaw told him that he would "go to his mother's and see what I can do, . . ."

As to motive, not only were they about to be evicted from the trailer park because of financial difficulties, but also it was shown that

insurance, the papers for which defendant Collins had in her purse at the time of the fire, paid off the note which they owed on the trailer. See *Kennedy v. State*, 172 Ga. App. 336, 340 (4) (323 SE2d 169) (1984).

As repeated in *Burns v. State*, 166 Ga. App. 766, 768 (3) (305 SE2d 398) (1983), also an arson case based on circumstantial evidence, we must "construe the evidence with every inference and presumption being in favor of upholding the jury's verdict . . . the jury is the final arbiter [of evidentiary conflict] . . . [A]fter the verdict is approved by the trial court, the evidence must be construed so as to uphold the verdict even where there are discrepancies. . . . An appellate court has no yardstick to determine what in a given case is a reasonable hypothesis except to rely on the informed and weigh[t]ed conclusions of twelve intelligent jurors . . . [who] heard the witness, and are better qualified to judge the reasonableness of a hypothesis raised by evidence (or its lack) than is this court which is restricted to a cold record and to issues of law."

I am authorized to state that Judge Pope and Judge Andrews join in this dissent.

DECIDED DECEMBER 4, 1991 —
RECONSIDERATION DISMISSED DECEMBER 19, 1991.

*Ronald C. Goulart*, for appellant (case no. A91A0957).

*Bruce & Hentz, W. Davis Hentz*, for appellant (case no. A91A0990).

*Ralph L. Van Pelt, Jr., District Attorney*, for appellee.

